PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NEWPORT NEWS HOLDINGS
CORPORATION,

         *Plaintiff-Appellee,*

        v.

VIRTUAL CITY VISION,
INCORPORATED, d/b/a VCV Inc.;
VAN JAMES BOND TRAN,

        *Defendants-Appellants.*

No. 09-1947

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
F. Bradford Stillman, Magistrate Judge.
(4:08-cv-00019-FBS)

Argued: January 27, 2011

Decided: April 18, 2011

Before WILKINSON, MOTZ, and DUNCAN,
Circuit Judges.

---

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Wilkinson and Judge Motz joined.

---

## COUNSEL

**ARGUED:** Geoffrey M. Bohn, BOHN & KOURETAS, PLC, Arlington, Virginia, for Appellants. Lisa A. Ferrari, COHEN,

2    NEWPORT NEWS HOLDINGS V. VIRTUAL CITY VISION

PONTANI, LIEBERMAN & PAVANE, New York, New York, for Appellee. **ON BRIEF:** Robert A. Battey, BOHN & KOURETAS, PLC, Arlington, Virginia; Shawn R. Farmer, MUSKIN & CUSICK LLC, Lansdale, Pennsylvania, for Appellants. Delphine Puybareau-Manaud, Martin B. Pavane, COHEN, PONTANI, LIEBERMAN & PAVANE, New York, New York, for Appellee.

---

## OPINION

DUNCAN, Circuit Judge:

This appeal raises numerous issues arising out of the grant of summary judgment to Newport News Holdings Corporation ("NNHC") on its claims against Virtual City Vision and its owner Van James Bond Tran (collectively, "VCV") under the Anticybersquatting Consumer Protection Act ("ACPA"). In addition to challenging summary judgment, VCV argues that the magistrate judge erred in refusing to recuse himself and in improperly finding personal jurisdiction over Tran.[1] VCV further contends that the district court abused its discretion in precluding VCV from filing a counterclaim, and in its various rulings on damages, fees and costs, and sanctions. For the reasons that follow, we affirm.

I.

A.

The number of issues raised on appeal necessitates a

---

[1]Pursuant to the Federal Magistrate Act of 1979, a magistrate judge presided over all aspects of this matter with the consent of the parties. *See* 28 U.S.C. § 636(c)(1). All references to "the district court" or "the court" in this opinion denote the magistrate judge. For the sake of clarity, however, in discussing the recusal issue we refer to the magistrate judge as such.

lengthy recitation of the facts and procedural history. We begin with the factual background.

NNHC is a women's clothing and accessories company that has been in existence for over twenty years. It owns five federally registered trademarks for the mark "Newport News." These trademarks cover the sale of women's clothing and accessories and the offering of these items for sale through catalogs and the Internet. The trademarks also cover the domain name newport-news.com, which NNHC purchased in November 1997. NNHC attempted to acquire the domain name newportnews.com as well, but VCV had already purchased that domain name in October 1997. NNHC began offering its goods for sale over the Internet in 1999 using the newport-news.com domain name.

VCV, an Alabama corporation, owns at least thirty-one domain names that incorporate the names of geographic locations. Newportnews.com, which initially focused on Newport News, Virginia, is one such example. VCV's "original intent . . . was to create websites . . . where residents of, and visitors to, these cities could find information and advertising related to th[e] cities." J.A. 1309 (internal quotations omitted).

VCV's organization is skeletal. Tran is its president, sole employee, and the only participating member of its board of directors. He operates the business from his home.

NNHC and VCV first clashed in a private dispute resolution forum. In 2000, NNHC brought a complaint against VCV under the Uniform Domain Name Dispute Resolution Policy of the Internet Corporation for Assigned Names and Numbers ("ICANN").[2] NNHC alleged that VCV's newportnews.com

---

[2]"ICANN is a private, non-profit public benefit corporation which was established by agencies of the U.S. government to administer the Internet domain name system." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 395 (2d Cir. 2004). Its dispute resolution proceedings are non-binding and are not intended to replace formal arbitration. *See Dluhos v. Strasberg*, 321 F.3d 365, 372 (3d Cir. 2003).

website was "confusingly similar to [NNHC's] family of reg-
istered trademarks for the mark 'Newport News'"; that "any
rights [VCV] has in the domain name in contention are illegit-
imate"; and that VCV "registered this domain name in bad
faith." J.A. 432.

The ICANN panel rejected NNHC's arguments and dis-
missed its complaint. In doing so, it found that, although the
mark and the domain name are identical, "visitors to
[NNHC's] branded web site, who seek out the latest women's
clothing and home fashions would clearly not be confused
when seeing a home page of another web site, bearing an
identical mark, that explicitly provides city information . . .
with no connection whatsoever to women's and home fash-
ions." J.A. 436. The panel further held that VCV's website
provided "bona fide service offerings," which included "dis-
seminat[ing] city information in an effort to increase tourism
and other visitor traffic to the city." J.A. 437. Significantly,
with respect to NNHC's claim of bad faith, the panel noted
that "given the total absence of competition between the busi-
nesses of [NNHC and VCV] . . . [VCV] did not register the
contested domain name in an effort to cause any likelihood of
confusion." J.A. 438.

Between 2000 and 2004, newportnews.com remained rela-
tively unchanged. It continued to provide information about
the city of Newport News and link visitors to local businesses,
such as hotels, movie theaters, real estate companies, and
entertainment venues. In 2004, the website began running
occasional advertisements for women's clothing.[3]

---

[3]Between 2004 and 2007, the newportnews.com website ran advertise-
ments for NNHC products on two occasions. The first occurred when an
advertising company hired by NNHC placed advertisements on the web-
site for one of the brands managed by NNHC, Spiegel Brands, without
NNHC's knowledge. Upon learning of this fact, NNHC ordered the adver-
tising company to cancel the advertisements. Then, between February and
March 2007, NNHC placed advertisements on the website in order to mea-
sure revenue losses attributable to the website.

In the summer of 2007, NNHC made an offer to purchase the newportnews.com domain name, which VCV rejected. VCV responded that it would sell the domain name for a "seven-figure" amount, or, in the alternative, sell NNHC goods on its website for a commission. J.A. 246-59.

A substantive evolution in the VCV website began in the fall of 2007. The site shifted from a city focus, similar to that of VCV's other locality sites, to one emphasizing women's fashions. By February of 2008, the homepage was dominated by advertisements for women's apparel.[4]

At about the same time, the management of the site changed as well. Tran began managing the newportnews.com website personally, taking control away from Local Matters, the company that ran VCV's locality sites. The changes to the website were lucrative. Tran would later testify that most of VCV's revenue during that time came from the newport-news.com website instead of the locality sites, either individually or in total.

B.

On February 21, 2008, NNHC filed its complaint with the district court, alleging trademark infringement under 15 U.S.C. § 1114, federal false advertising and unfair competition under 15 U.S.C. § 1125(a), copyright infringement under 15 U.S.C. § 501, and state law claims of common law trademark infringement, unfair competition, and unjust enrich-

---

[4]For example, the top of the website's homepage contained two banners: one with the title "NewportNews.com #1 Shopping Destinations" and the other with the "Top 5 Stores." Both banners included within them a number of links to women's fashion items. The right column of the homepage consisted almost entirely of links to clothing stores. The left column contained several large advertisements for women's retailers. The middle of the homepage contained numerous pictures of women's apparel, followed by the prices for those items and links to the retailers.

ment. The parties agreed to have the matter handled by a
federal magistrate judge.

While discovery was underway in September 2008, the
magistrate judge informed the parties that counsel for NNHC
had served on the advisory panel that voted to reappoint him.
Both because his only action in the case to that point had been
to issue a scheduling order, and because the reappointment
committee had concluded its work, he opined that he was not
obligated to recuse himself under the Code of Conduct for
United States Judges. He nevertheless asked the parties
whether they wanted to seek his recusal and promised to give
full consideration to any such request. On September 12,
2008, both parties indicated that they would not seek recusal.
VCV's counsel specifically stated that he was satisfied that
the magistrate judge could preside.

Shortly thereafter, counsel for NNHC mentioned that he
and the magistrate judge had previously practiced at the same
law firm and had worked on cases together. VCV's counsel
did not raise the issue of recusal during that discussion or the
subsequent pretrial conference.

In October 2008, NNHC informed VCV that it intended to
file an amended complaint. VCV responded that it would file
a counterclaim based on evidence obtained through discovery.
On November 20, 2008, after obtaining leave from the court,
NNHC filed its amended complaint adding a claim for viola-
tion of the ACPA and removing its copyright infringement
claim. On November 25, 2008, VCV answered the amended
complaint but did not raise any counterclaims. On November
28, 2008, the parties filed cross-motions for summary judg-
ment, with VCV moving for summary judgment on all of
NNHC's claims and NNHC moving for partial summary
judgment as to the ACPA claim. On January 9, 2009, VCV
filed its counterclaim. The court informed VCV that, under
the Federal Rules of Civil Procedure, VCV was required to
request leave from the court to amend its answer to include

a counterclaim. VCV sought leave to file its counterclaim on January 16, 2009.

On February 3, 2009, the magistrate judge issued an order granting summary judgment to NNHC on its ACPA claim pertaining to the newportnews.com domain name. Because NNHC had not moved for summary judgment on its other claims, those claims remained set for trial scheduled to begin on February 9. During a telephone conference that same day, VCV moved for the magistrate judge's recusal for the first time.

The magistrate judge vacated the February 9 trial date and established a briefing schedule to consider the recusal motion. On March 13, 2009, the magistrate judge held a hearing both on VCV's motion for recusal and its motion for leave to file a counterclaim; he denied both.

On June 6, 2009, VCV sought reconsideration of its recusal motion, which the magistrate judge denied on July 23. The following day, the court issued a Final Order awarding VCV costs on NNHC's abandoned copyright infringement claim but denying its motion for attorney's fees on that claim. The Final Order also awarded NNHC statutory damages and attorney's fees on its ACPA claim and imposed sanctions on VCV's counsel.[5] VCV timely appealed.

II.

VCV asserts numerous issues on appeal: the magistrate judge's failure to recuse; the court's assertion of personal jurisdiction over Tran; its grant of summary judgment to NNHC on the ACPA claim; its denial of VCV's request to file a counterclaim; its award of statutory damages and attorney's fees to NNHC and sanctions against VCV's counsel;

---

[5]The district court dismissed all of NNHC's remaining claims without prejudice under Rule 41(a)(2) of the Federal Rules of Civil Procedure.

and its finding that VCV was not the prevailing party for purposes of an award of attorney's fees on NNHC's abandoned copyright infringement claim. We address each argument in turn.

### A.

VCV challenges the denial of its motion for recusal under 28 U.S.C. § 455 and the denial of its motion for reconsideration seeking recusal. We review for abuse of discretion. *United States v. Mitchell*, 886 F.2d 667, 671 (4th Cir. 1989).

Section 455(a) states: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." As we have noted, "[t]imeliness is an essential element of a recusal motion. . . . To prevent inefficiency and delay, motions to recuse must be filed at the first opportunity after discovery of the facts tending to prove disqualification." *United States v. Whorley*, 550 F.3d 326, 339 (4th Cir. 2008) (first alteration in original) (internal quotations omitted); *see also United States v. Owens*, 902 F.2d 1154, 1155 (4th Cir. 1990) (noting that timeliness is a "judicially implied" element of § 455). VCV's recusal argument is predicated on two facts: (1) that the magistrate judge and NNHC counsel once worked at the same law firm and collaborated on cases; and (2) that NNHC counsel participated in the committee that reappointed the magistrate judge.

VCV learned of opposing counsel's participation on the reappointment committee no later than September 11, 2008, and expressly declined to move for recusal when the court held a phone conference on the issue the next day. In fact, VCV affirmatively communicated its satisfaction with the magistrate judge continuing to preside. VCV learned of the law firm relationship on November 7, 2008, but did not raise the issue during the scheduling conference that took place that same day. In fact, it did not move for recusal until February

3, 2009, the day the court issued a partial summary judgment ruling in favor of NNHC. By way of explanation, VCV asserts only that "[e]lucidation of the relevant facts took time." Appellants' Br. at 7. We are not persuaded.

VCV had an opportunity to raise the issue almost immediately after becoming aware of the facts of which it now complains, and it chose not to do so. Instead, it waited several months, until the very day the magistrate judge granted summary judgment to NNHC on its ACPA claims. The timing of VCV's motion smacks of gamesmanship. Allowing such belated and seemingly tactical recusal motions would permit a party "to gather evidence of a judge's possible bias and then wait and see if the proceedings went his way before using the information to seek recusal." *Sine v. Local No. 992 Int'l Bhd. of Teamsters*, 882 F.2d 913, 916 (4th Cir. 1989). The magistrate judge's denial of the motion for recusal is therefore justified on timeliness grounds alone. *Id.* at 915-16 (finding lack of timeliness to be an alternative ground for affirming the denial of a motion to recuse).

Furthermore, VCV's allegations regarding recusal lack merit. The issue of NNHC's counsel's involvement on the reappointment committee is addressed in an advisory opinion on the Code of Conduct for United States Judges, which provides that "after reappointment the magistrate judge is not required to recuse or to notify the parties and attorneys in the proceeding that a member of the panel is appearing as counsel." J.A. 1414 n.4 (citing Committee on Codes of Conduct, Advisory Opinion No. 97: *Recusal Due to Appointment or Reappointment of a Magistrate Judge* (Oct. 13, 1999)).

As to the law firm relationship between counsel and the magistrate judge, the "objective standard asks whether the judge's impartiality might be questioned by a reasonable, well-informed observer who assesses all the facts and circumstances." *United States v. DeTemple*, 162 F.3d 279, 286 (4th Cir. 1998) (internal quotations omitted). The law firm rela-

tionship in question ended more than ten years before the instant action began, and VCV does not seem to dispute the fact that the magistrate judge had little personal contact with counsel in the intervening years. Under these circumstances, the magistrate judge did not abuse his discretion in finding that the circumstances would not cause a reasonable observer to question his impartiality.[6]

### B.

VCV also claims that the district court failed to make findings that would justify exercising personal jurisdiction over Tran and holding him personally liable for VCV's actions. We review the district court's legal findings de novo and the facts underlying its determination for clear error. *Mylan Lab., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).

Contrary to VCV's contention, the district court made sufficient findings to establish personal jurisdiction as part of its analysis regarding piercing of the corporate veil between Tran and VCV. As the Fifth Circuit has noted:

> [F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual . . . that would not ordinarily be subject to personal jurisdiction in that court when the individual . . . is an alter

---

[6]VCV also argues that the magistrate judge's representation of the city of Newport News, Virginia in civil rights and employment matters over ten years ago required his disqualification. VCV apparently relies on 28 U.S.C. § 455(b)(1), which states that a judge "shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." However, VCV fails to point to anything in the record that would support the contention that the representation of the city of Newport News in completely unrelated matters more than a decade earlier gave the judge personal knowledge of facts relevant to the current proceedings. Accordingly, its assertion is unpersuasive.

ego . . . of a corporation that would be subject to personal jurisdiction in that court.

*Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 n. 18 (5th Cir. 2002) (collecting cases); *see also Mylan Labs*, 2 F.3d at 63 (declaring in the analogous context of Maryland law that the analysis of whether the court could pierce the corporate veil of a corporation to reach its parent company is "virtually identical" to the analysis of whether the court could exercise personal jurisdiction over that parent company); *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (endorsing "the use of the alter-ego theory to exercise personal jurisdiction").

Under Virginia law, a court may pierce the corporate veil to find that an individual is the alter ego of a corporation where it finds "(i) a unity of interest and ownership between [the individual and the corporation], and (ii) that [the individual] used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 132 (4th Cir. 2002) (internal quotations omitted). Here the district court found that such veil piercing was appropriate because:

> VCV had no separate identity from Tran. . . . Tran is the President of VCV, Tran is the sole employee of VCV, and Tran is the only participating member of VCV's Board of Directors. . . . Additionally, Tran admits that VCV's business is conducted out of his home and Tran is the only board member invited to, and present at, meetings of the VCV Board of Directors. . . . It is Tran, and Tran alone, who is responsible for the decisions and actions of VCV . . . and it would present a manifest injustice if Tran were now allowed to hide behind a non-existent corporate veil to avoid personal liability for his actions. There is a unity of interest and ownership between Tran and

> VCV, and Tran controlled and used VCV to commit
> an injustice.

J.A. 2123 n.5. The court clearly found both a unity of interest
and an intent by Tran to "commit an injustice" using VCV.
*C.F. Trust, Inc.*, 306 F.3d at 132. Accordingly, the district
court found sufficient facts to pierce the corporate veil and,
consequently, to exercise its jurisdiction over Tran.

## C.

VCV challenges the district court's grant of summary judg-
ment in favor of NNHC on its claim under the ACPA. We
review de novo an award of summary judgment, viewing all
facts and drawing all reasonable inferences in the light most
favorable to the nonmoving party. *See EEOC v. Navy Fed.
Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). Summary
judgment is appropriate when there is no genuine dispute as
to any material fact and the movant is entitled to judgment as
a matter of law. Fed. R. Civ. P. 56(a). "[T]here is no issue for
trial unless there is sufficient evidence favoring the nonmov-
ing party for a jury to return a verdict for that party." *Ander-
son v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

To establish an ACPA violation, NNHC was required to
"(1) prove that [VCV] had a bad faith intent to profit from
using the [newportnews.com] domain name, and (2) that the
. . . domain name is identical or confusingly similar to, or
dilutive of, the distinctive and famous [Newport News]
Mark." *People for the Ethical Treatment of Animals ("PETA")
v. Doughney*, 263 F.3d 359, 367 (4th Cir. 2001) (citing 15
U.S.C. § 1125(d)(1)(A)).

VCV argues in particular that the district court erred in
finding that VCV acted in bad faith, and that it mistakenly
rejected VCV's defenses of laches and acquiescence.[7] We
address each contention in turn.

---

[7]VCV additionally claims that the district court erred by not considering
any of its sealed exhibits related to summary judgment. It cites as its only

## 1.

We first consider the issue of bad faith. The ACPA directs courts to consider several factors in making a determination of bad faith. These include whether the defendant has a "bona fide noncommercial or fair use of the mark in a site accessible under the domain name" and whether the defendant intended to divert customers away from the trademark holder by "creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." 15 U.S.C. § 1125(d)(1)(B)(i). Courts are not limited to consideration of these factors. Instead, "[t]he ACPA allows a court to view the totality of the circumstances in making the bad faith determination." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001).

---

support for this argument that the court failed to mention any of its exhibits in its opinion. Courts are not required to identify every piece of evidence they consider in making a decision. Accordingly, VCV's argument is wholly without merit.

VCV also asserts that NNHC's Newport News trademark is not valid because it is not distinctive. We have held that, "[u]nder the Lanham Act, the issuance of a certificate of registration arms the registrant with prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark." *Retail Servs. v. Freebies Publ'g*, 364 F.3d 535, 542 (4th Cir. 2004) (internal quotations omitted). Here, VCV asserts that it overcame this presumption because it presented evidence that NNHC's mark related to its city of origin and was therefore geographically descriptive, not distinctive. A geographically descriptive mark is nevertheless distinctive if it has acquired a secondary meaning, that is, if "the mark no longer causes the public to associate the goods with the geographical location, but to associate the goods with a particular product or source of the product." *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 340 (4th Cir. 2009). Thus, assuming for the sake of argument that the mark is geographically descriptive, the presumption of validity derived from the mark's registration would necessarily create a presumption that the mark has a secondary meaning. Given that VCV presented no evidence to refute this presumption, the district court was correct in rejecting VCV's challenge to the validity of the mark.

14    NEWPORT NEWS HOLDINGS V. VIRTUAL CITY VISION

VCV challenges the district court's finding of bad faith in several respects. It attacks the court's determination that VCV did not provide legitimate services that would constitute a fair use of the domain name. VCV also asserts that the evidence does not support a finding that it intended to create a likelihood of confusion. Finally, it challenges the court's reliance on the ICANN ruling as evidence that VCV knew it was acting unlawfully when it changed its website.

a.

VCV claims that, contrary to the district court's conclusion, its website offered a legitimate service by providing information about the city of Newport News.

The ACPA permits a registered trademark to be used by someone other than the mark owner if it is a "use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin." 15 U.S.C. § 1115(b)(4). The district court found that this provision did not apply here because "[o]n VCV's website, Newport News is no longer used to describe VCV's goods or services, or their geographic origin, because the site is dedicated primarily to women's fashion." J.A. 1323-24. VCV disputes this characterization, contending to the contrary that its website offered the legitimate service of providing information about the city of Newport News. We disagree.

The record conclusively shows that in making changes to its website in 2007, VCV shifted its focus away from the legitimate service of providing information related to the city of Newport News and became instead a website devoted primarily to women's fashion. Most of the items on its homepage, as well as those most prominently placed, related to women's attire. Not only was the site dominated by advertisements for apparel, it also contained dozens of links to shopping websites. The website's references to the city of Newport

News became minor in comparison to the fashion-related content. VCV cannot escape the consequences of its deliberate metamorphosis. VCV would apparently have us hold that as long as it provided any information about the city of Newport News, it continued to provide a "bona fide" service. Such a formalistic approach would allow a cybersquatter seeking to profit from another company's trademark to avoid liability by ensuring that it provides some minimal amount of information about a legitimate subject. It would also undermine the purpose of the ACPA, which seeks to prevent "the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks." *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona*, 330 F.3d 617, 624 (4th Cir. 2003) (quoting S. Rep. No. 106-140, at 4 (1999)).

As we have noted, in analyzing bad faith, we "view the totality of the circumstances." *Virtual Works*, 238 F.3d at 270. Here, even drawing all reasonable inferences in favor of VCV, the record is clear that after November 2007, VCV was no longer in the business of providing information about the city of Newport News. The contrast between the newport-news.com website and VCV's other locality websites, which were dominated by links and advertisements for businesses and activities in those cities, is stark. Unlike those websites, newportnews.com went from being a website about a city that happened to have some apparel advertisements to a website about women's apparel that happened to include minimal references to the city of Newport News. The district court correctly held that, once VCV largely abandoned its city information service, it ceased to have a right to use the name of Newport News to describe such service.[8]

---

[8]We also note that, even if VCV had been able to show some measure of fair use, that would not be enough to preclude liability. "[T]he use of a domain name in connection with a site that makes a . . . fair use of the mark does not necessarily mean that the domain name registrant lacked bad faith." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 778 (8th Cir. 2004) (internal quotations omitted).

b.

VCV argues that the district court failed to properly ana-
lyze whether there was a likelihood of confusion between
NNHC's website and VCV's website. Its argument, however,
mischaracterizes the nature of an ACPA claim. The standard
under the ACPA is not whether there is a likelihood of confu-
sion between the two websites but rather whether the alleg-
edly offending website "creat[es] a likelihood of confusion as
to the source, sponsorship, affiliation, or endorsement of the
site." 15 U.S.C. § 1125(d)(1)(B)(v). The ACPA provides for
liability "without regard to the goods or services of the par-
ties." *Id.* § 1125(d)(1)(A).

VCV argues that, under our precedent in *Lamparello v.
Falwell*, 420 F.3d 309 (4th Cir. 2005), we must "determine
whether a likelihood of confusion exists by 'examin[ing] the
allegedly infringing use in the context in which it is seen by
the ordinary consumer.'" *Id.* at 316 (alteration in original).
However, the court in *Lamparello* made that statement in the
context of trademark infringement, not the ACPA. *See id.* As
the Eighth Circuit court has noted, "[t]he inquiry under the
ACPA is . . . narrower than the traditional multifactor likeli-
hood of confusion test for trademark infringement." *Coca-
Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004); *see also
N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 66 n.14
(1st Cir. 2001) ("[T]he likelihood of confusion test of trade-
mark infringement is more comprehensive than the identical
or confusingly similar requirement of ACPA, as it requires
considering factors beyond the facial similarity of the two
marks." (internal quotations omitted)). "The question under
the ACPA is . . . whether the domain names which [the defen-
dant] registered . . . are identical or confusingly similar to a
plaintiff's mark." *Coca-Cola Co.*, 382 F.3d at 783. Here
VCV's domain name was identical to NNHC's mark.

VCV further alleges that its disclaimer, "We are Newport
News, Virginia," which appeared near the top of the new ver-

sion of the website, eliminated any likelihood of confusion.
Again, VCV misinterprets the applicable law. For ACPA pur-
poses, "[t]he fact that confusion about a website's source or
sponsorship could be resolved by visiting the website is not
relevant to whether the domain name itself is identical or con-
fusingly similar to a plaintiff's mark." *Id.*; *see also Virtual
Works*, 238 F.3d at 271 (finding that the domain name vw.net
was confusingly similar to the Volkswagen "VW" mark for
purposes of the ACPA, even though the domain name was
being used as an internet service provider's website); *PETA*,
263 F.3d at 366-67 (finding likelihood of confusion under the
ACPA where the domain name was identical to the trademark
at issue, even though the "website's content ma[de] it clear
that it [was] not related to" the mark holder). Given that
VCV's domain name was identical to NNHC's mark, we find
that the district court correctly held that VCV created a likeli-
hood of confusion as to the source of the site.

c.

VCV argues that the district court erred in finding that the
ICANN decision was further proof of VCV's bad faith in
making the November 2008 changes to its website. It asserts
that, because the ICANN decision did not prohibit any of the
changes made by VCV, VCV's awareness of the decision
does not support a finding that it made the changes in bad
faith.

VCV's argument misses the mark here as well. What the
court deemed most significant was that the ICANN decision
found VCV's use proper precisely because its business of pro-
viding city information was unrelated to NNHC's clothing
business. The ICANN decision found that VCV was not in
competition with NNHC precisely because of their disparate
business models. Indeed, in holding that there was no evi-
dence of bad faith on the part of VCV, the ICANN relied on
"*the total absence of competition between the businesses of
[NNHC and VCV]*." J.A. 438 (emphasis added). The fact that,

in the face of this cautionary language, VCV later purposefully transformed its website into one that competed with NNHC by advertising women's apparel is a legitimate factor within the totality of the circumstances supporting the district court's finding of bad faith.[9]

### 2.

VCV next asserts that the district court mistakenly rejected its defense of laches. VCV argues that laches applied because NNHC did not bring a claim in 2005, when, under VCV's view, "the allegedly infirming use (the ads for women's clothing) actually commenced." Appellants' Br. at 21.

Preliminarily, we note that VCV points to no case in this or other circuits that has ever applied the laches defense in the ACPA context. Nor are we aware of any. However, even assuming, without deciding, that the doctrine of laches is applicable to ACPA claims, it would not bar relief here. In the trademark context, "courts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 461 (4th Cir. 1996). We have explained that "regardless of when the trademark owner initially discovers the use of a similar mark, action against the infringing user is not necessary until, in light of the circumstances, the 'right to protection has clearly

---

[9]VCV's argument that the district court failed to consider the safe-harbor fair use defense fails as well. Under the ACPA's safe-harbor provision, "[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). The district court's specific finding that "VCV knew or should have known" that the November 2007 changes to its website "would give rise to some type of liability," J.A. 1329, defeats any contention that VCV "believed and had reasonable grounds to believe" that its use of the domain name was lawful.

ripened.'" *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi*, 357 F.3d 441, 449 (4th Cir. 2004). In other words, the plaintiff must be aware of the facts giving rise to infringement.

An ACPA claim, as we have noted, requires a "bad faith intent to profit from using the . . . domain name." *PETA*, 263 F.3d at 367. Here, as the ICANN panel decision found, before the changes in the website NNHC had no reason to believe that VCV's use of the domain name would support a finding of bad faith. Even when VCV started to place a few apparel ads on its otherwise city-focused website in 2005, VCV's bad faith was not obvious, as VCV was still providing a legitimate city-information service and not competing with NNHC. It was not until November 2007, when VCV essentially abandoned its legitimate purpose of providing city-based information in favor of a website focused on women's fashions, that it became clear that NNHC had a viable ACPA claim. Accordingly, NNHC's decision to bring its ACPA claim in November 2008, a year after the relevant changes in VCV's website occurred, did not constitute an unreasonable delay that would support a finding of laches.

### 3.

VCV also asserts that NNHC's ACPA claim "should have been completely barred by NNHC's acquiescence." Appellants' Br. at 22. Again, VCV cites no support for the proposition that this defense applies in the ACPA context. However, once again assuming, without deciding, that it does, it is nevertheless inapplicable to the facts here.

In the trademark infringement context we have stated that "[a]n infringement action may be barred by the doctrine of estoppel by acquiescence where the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement." *Sara Lee Corp.*, 81 F.3d at 462. VCV argues that NNHC

impliedly consented to the infringement by "knowingly and deliberately plac[ing] paid ads on the VCV website in February 2007." Appellants' Br. at 22. However, as discussed above, VCV's use of the domain name did not become a clear infringement until November 2007, when VCV transformed its website into one focused on women's fashion. Therefore NNHC's advertisements in February 2007 cannot establish its acquiescence to VCV's later infringing conduct, and we agree with the district court that NNHC's ACPA claim was not barred on that ground.

### D.

VCV next argues that the court erred in denying it permission to file counterclaims. In determining whether a defendant should be permitted to file a new counterclaim after it has filed its responsive pleading, "Rule 13(f) of the Federal Rules of Civil Procedure, which permits amendment of the pleadings to add an omitted counterclaim, is interpreted together with Rule 15(a) on amendment of pleadings, which provides that 'leave [to amend] shall be freely given when justice so requires.'" *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*, 43 F.3d 922, 940 (4th Cir. 1995) (alteration in original). We have further pointed out "that a motion to amend may be denied when it has been unduly delayed and when allowing the motion would prejudice the nonmovant." *Id.* at 941. Leave to amend by filing a counterclaim may also be denied based on bad faith or futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). We review a district court's ruling in this regard for abuse of discretion. *Lone Star*, 43 F.3d at 940.

In October 2008, VCV informed NNHC that VCV would seek leave to file a counterclaim based upon evidence obtained through discovery. On November 20, 2008, after obtaining leave from the court, NNHC filed an amended complaint adding a new claim for violation of the ACPA. On

November 25, VCV filed an answer to the amended com-
plaint, but that answer did not raise any counterclaims.

VCV filed its counterclaim, without leave from the court,
on January 9, 2009, one month before the then-scheduled trial
date of February 9. The counterclaim included allegations of
conspiracy and fraud by NNHC. The court informed VCV
that leave from the court was required to file a counterclaim.
VCV sought leave on January 16, 2009. The motion was not
fully briefed until January 28, 2009, two weeks before the
scheduled trial date. On February 3, 2009, the district court
issued an opinion granting in part NNHC's motion for sum-
mary judgment on its cybersquatting claim. The court ulti-
mately denied VCV's motion for leave to file its counterclaim
on March 13, 2009, finding that it was prejudicial and unduly
delayed in bad faith.[10]

"Whether an amendment is prejudicial will often be deter-
mined by the nature of the amendment and its timing. . . .
[T]he further the case progressed before judgment was
entered, the more likely it is that the amendment will preju-
dice the defendant or that a court will find bad faith on the
plaintiff's part." *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir.
2006). Here, the court's finding of prejudice was based on the
fact that the counterclaim was filed at the "eleventh hour
before the then-scheduled trial date" and contained six claims
that had never before been raised and "if allowed, [would]
substantially change the nature and scope of the trial." J.A.
1434-35. The counterclaim included counts for intentional

---

[10]The court also found that the counterclaims were probably moot
because they "would almost certainly not survive a . . . motion to dismiss"
and "VCV acknowledged the likely futility of the Counterclaim." J.A.
1438. It also noted that VCV's claims "assume[ ] VCV's right to use the
. . . domain name, but the Court held that VCV's use of that domain name
violated the [ACPA] and ordered VCV to transfer the domain name to
NNHC." *Id.* However, because we find that the district court's other rea-
sons for denying the claim were independently sufficient, we need not
address the issue of futility.

interference with contract, tortious interference with prospec-
tive economic advantage, fraud, constructive fraud, civil con-
spiracy between NNHC and Spiegel, and intentional infliction
of emotional harm. The district court found that discovery in
the case had closed and "the introduction of six new claims,
particularly a claim of fraud, may introduce new factual issues
that were not heretofore addressed by counsel." J.A. 1435.
Indeed, several of VCV's assertions, such as its claim that
NNHC and Spiegel "entered into an unlawful agreement and
conspiracy with each other to . . . wrongfully take 'newport-
news.com,'" J.A. 846, would likely have required further dis-
covery.

A district court has the discretion to deny leave to amend
to add a counterclaim "based upon a balancing of the equities,
including whether . . . additional discovery [would] be
required." *Barnes Group, Inc. v. C & C Products, Inc.*, 716
F.2d 1023, 1035 n.35 (4th Cir. 1983). The fact that allowing
the counterclaim would probably have necessitated additional
discovery supports our conclusion that the district court's
finding of prejudice was not an abuse of discretion.

We note as well that VCV appeared to have no valid reason
for its belated request. VCV first informed NNHC of the pos-
sibility of the counterclaim in October 2008. Indeed, VCV
now concedes that, by October 15, 2008, it suspected the
grounds for the claim. However, VCV argues that it did not
seek to file the counterclaim at that point because "until VCV
actually received NNHC's financial records in late December
2008, and had them interpreted by an expert, VCV lacked suf-
ficient legal foundation to file the counterclaim." Appellants'
Br. at 25.

This explanation rings hollow because none of the counts
in the counterclaim relied primarily on allegations regarding
NNHC's financial records. Each of the claims was based on
the theory that VCV was fairly and lawfully using the domain
name and NNHC was unlawfully interfering with its right to

do so in an attempt to obtain the domain name free of charge. None of the counts directly mention any wrongdoing related to NNHC's financial documents. In fact, the financial data that NNHC disclosed to VCV in December 2008, which allegedly triggered the counterclaim, is only mentioned in the background facts. Thus, VCV's assertion that it was justified in waiting until December 2008 to file the claim is unsupported by the record.

We have upheld a district court's denial of leave to file a counterclaim in substantially similar circumstances. In *Lone Star Steakhouse*, the defendant in a trademark infringement suit sought leave, in the last days of discovery, to add a counterclaim alleging that the plaintiff had committed fraud. *See* 43 F.3d at 940-41. The defendant based its claim on information that, according to the district court, it possessed approximately three months before requesting leave to file the counterclaim. The district court refused to "inject the defense of fraud," because it "considered the motion unduly delayed and reasoned that the amendment would have seriously prejudiced Plaintiffs and placed them at risk of further infringement because the amendment would have delayed the resolution of the case." *Id.* at 940. In affirming the decision of the district court, we found that the record did not support the defendant's contention that it delayed its counterclaim because it needed to conduct further investigation. *Id.*

We also held that the amendment "would have substantially prejudiced Plaintiffs and would have significantly changed the nature of the litigation" because "[i]nserting the defense of fraud in the case on the last day of discovery would have raised new issues, which were not involved in the case during the discovery and were not the subject of Plaintiff's discovery and trial preparation." *Id.* Under the similar circumstances presented here, we hold that, given VCV's undue delay and the prejudice to NNHC, the district court did not abuse its discretion in denying VCV's motion for leave to file a counterclaim.

E.

VCV argues that its conduct did not merit an award of attorney's fees under the Lanham Act. The Act states that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). We review "a decision to award attorneys' fees under § 1117 for abuse of discretion and the district court's underlying finding as to whether the case is exceptional for clear error." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 490 (5th Cir. 2004); *see also Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 634 (4th Cir. 2010).

We have noted that the legislative history of the Lanham Act shows that fees were intended to be provided in cases involving "[d]eliberate and flagrant infringement." *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 599 (4th Cir. 1992) (quoting legislative history). Here, the district court found that VCV's conduct was exceptional precisely because "its actions in transforming the virtual city website into a women's fashion website after being made aware [by the ICANN decision] of the rights that NNHC had in the NEWPORT NEWS mark were clearly willful and deliberate." J.A. 2125. Significantly, VCV advances no factual basis for finding to the contrary. Neither during the proceedings below nor in response to repeated questioning at oral argument on appeal was VCV able to provide a legitimate justification for its decision to shift its website's focus to women's clothing, particularly in the face of the ICANN panel's implicit suggestion that to do so courted the risk of a finding of bad faith. On these facts, we cannot say that the court clearly erred in finding that VCV's infringement was exceptional or abused its discretion in awarding attorney's fees.

F.

VCV also challenges the district court's grant of statutory damages of $80,000 under 15 U.S.C. § 1117(d), which pro-

vides that "the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." VCV claims the damages awarded here were excessive. "While we review for clear error any factual finding that would determine the appropriate level of statutory damages, we would review an award of those damages within the statutory range for abuse of discretion." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001).

   In deciding whether the court's damages were excessive, we must first determine the nature and purpose of such damages. Our analysis of ACPA statutory damages is guided, in part, by their similarity to statutory damages under the Federal Copyright Act, 17 U.S.C. § 501(a)—a similarity noted by other circuit courts. *See, e.g.*, *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1205 (11th Cir. 2009) ("[T]he statutory damages provision in the ACPA, 15 U.S.C. § 1117(d), is similar to the statutory damages provision in copyright law."); *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 278 (5th Cir. 2002). Both statutory damages provisions have similar structures and language. *See* 17 U.S.C. § 504(c)(1) ("[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action . . . in a sum of not less than $750 or more than $30,000 as the court considers just."). Also, like the Copyright Act, the ACPA reflects a Congressional intent to deter offenders. *See St. Luke's*, 573 F.3d at 1206 & n.32. Based on this goal of deterrence, the Supreme Court has found that the statutory damages provision of the Copyright Act does "not merely compel[ ] restitution of profit and reparation for injury but also is designed to discourage wrongful conduct." *E. & J. Gallo Winery*, 286 F.3d at 278 (quoting *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952)). "In light of the similarities in the lan-

guage of these two statutory provisions and Congress's intent to deter cyberpiracy, other circuits have interpreted the ACPA's statutory damages provision to contain a [similar] deterrence element." *St. Luke's*, 573 F.3d at 1206 (citing *E. & J. Gallo Winery*, 286 F.3d at 278) (footnote omitted). We find such interpretations persuasive. Because these damages "serve[ ] as a sanction to deter wrongful conduct," *id.*, a district court may properly weigh the seriousness of the conduct in determining the amount of the award.

Here the district court found that damages at the high end of the statutory range were proper because VCV's conduct was "exceptional and egregious."[11] JA 2123. VCV asserts that the damages award was unjust for reasons that both mirror its laches and acquiescence arguments and fail for reasons similar to those already set forth. VCV claims that it advertised women's clothes for over two years (2005-2007) before NNHC brought its claim, and that during that time, NNHC profited from advertising with VCV and had discussions with VCV about its website in which no infringement was mentioned. However, as noted above, the district court made clear throughout its opinion that VCV's wrongdoing did not crystallize until its "transformation of the NEWPORT-NEWS.COM website into a women's fashion website" in November 2007 "in direct contradiction to a written [ICANN] arbitration opinion." J.A. 1222. It is this conduct that the court found "exceptional and egregious" for purposes of statutory sanctions. J.A. 2123. VCV's arguments about why its conduct may not have been egregious prior to November 2007 are irrelevant. We conclude that the district court did not abuse its discretion by finding that VCV's attempt to profit from NNHC's mark by creating a website focused on women's

---

[11]The court found, citing a district court opinion, that "high-end" damages are awarded where the conduct is "egregious" and "exceptional," and found VCV's conduct to be so. J.A. 2122-23 (citing *Int'l Bancorp, L.L.C. v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 192 F. Supp. 2d 467, 490 (E.D. Va. 2002)).

fashion was sufficiently egregious to merit the statutory damages award.

### G.

VCV challenges the district court's entry of $10,000 in sanctions against VCV's attorneys under 28 U.S.C. § 1927. We review the decision to award sanctions for abuse of discretion, *Chaudhry v. Gallerizzo*, 174 F.3d 394, 410 (4th Cir. 1999), and the factual findings underpinning that decision for clear error, *see Ohio River Valley Envtl. Coal., Inc. v. Green Valley Coal Co.*, 511 F.3d 407, 413 (4th Cir. 2007); *see also Tenkku v. Normandy Bank*, 348 F.3d 737, 743-44 (8th Cir. 2003) (reviewing for abuse of discretion an award of § 1927 sanctions and for clear error the related factual findings). However, before reviewing the court's decision, we must first decide whether the issue is properly before us.

NNHC argues that VCV waived the issue because its attorneys are not listed as appellants in the notice of appeal. Indeed, Federal Rule of Appellate Procedure 3(c)(1)(A) requires that the notice of appeal "specify the party or parties taking the appeal by naming each one in the caption or body of the notice." Rule 3(c)(4) makes clear, however, that "[a]n appeal must not be dismissed for . . . failure to name a party whose intent to appeal is otherwise clear from the notice." Under Rule 3(c)(4), we have held that a notice of appeal that covers only an order for sanctions against an attorney is not rendered invalid for failure to name the attorney as an appellant. *Miltier v. Downes*, 935 F.2d 660, 663 n.1 (4th Cir. 1991). We noted that where "the only appealable judgment from the district court is the order imposing sanctions against counsel" and "only one party, plaintiff's counsel, is entitled to bring the appeal . . . [t]he circumstances . . . present no risk of ambiguity or confusion." *Id.*

Applying Rule 3(c)(4) to the facts before us, we find that VCV's notice of appeal is far from a model of clarity.

Although the notice lists the Final Order as one of the orders appealed, the Final Order contains a number of rulings, several of which were not appealed. VCV has thereby created the "risk of ambiguity or confusion" against which we have cautioned. *Id.* Tellingly, VCV does not address the issue of sanctions in its Reply Brief, or argue that the deficient notice of appeal is saved by its clear intent under Rule 3(c)(4).

In any event, even assuming that the notice of appeal was proper, the court's award of sanctions does not merit reversal. Section 1927 states: "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 22 U.S.C. § 1947. "A district court's decision to impose sanctions is entitled to 'substantial deference'" because "[a] district court 'is in the best position to review the factual circumstances and render an informed judgment as [it] is intimately involved with the case, the litigants, and the attorneys on a daily basis.'" *Blue v. U.S. Dept. of Army*, 914 F.2d 525, 538 (4th Cir. 1990).

The district court found that VCV's "Motion for Recusal was made recklessly and in bad faith" and that VCV "more likely than not acted in bad faith in seeking leave to file its counterclaim." J.A. 2132. It concluded that VCV's counsel "engaged in a pattern of behavior to delay the resolution of this case and . . . unreasonably and vexatiously multiplied the proceedings." *Id.* at 2134. Relying on the facts we have already outlined, and given the motions' significant substantive weaknesses as well as their suspicious timing, we cannot say that the district court clearly erred in its factual finding that they were filed with the purpose of multiplying proceedings. *See United States v. Wallace*, 964 F.2d 1214, 1217 (D.C. Cir. 1992) (describing a finding of bad faith as a factual finding reviewable for clear error). We therefore hold that the district court's award of sanctions was not an abuse of discretion.

## H.

Finally, VCV argues that the district court erred in awarding it only costs but not attorney's fees on NNHC's abandoned copyright claim. VCV alleges entitlement to attorneys' fees as a prevailing party under 17 U.S.C. § 505, which states "the court may allow the recovery of full costs by or against any party . . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of costs." "[I]f the district court determines, as a matter of law, that a party is not a prevailing party, we review the district court's determination de novo." *Perry v. Bartlett*, 231 F.3d 155, 163 (4th Cir. 2000).

NNHC raised the copyright infringement claim in its original complaint, but did not raise it in its amended complaint. VCV argues that, because the district court granted leave for NNHC to file its amended complaint, NNHC "dismissed its copyright infringement claim, by court order." Appellants' Br. at 30. We disagree.

The district court correctly held that NNHC's abandonment of the claim did not make VCV a prevailing party on that claim. In order for a litigant to be a prevailing party for purposes of attorneys' fees, there must be a "judicially sanctioned change in the legal relationship of the parties." *Buckhannon Bd. & Care Home v. W.V. Dept. of Health & Human Res.*, 532 U.S. 598, 605 (2001). As the Supreme Court has noted, "[n]o material alteration of the legal relationship between the parties occurs until" one of the parties "becomes entitled to enforce a judgment, consent decree, or settlement against the [other]." *Farrar v. Hobby*, 506 U.S. 103, 113 (1992). Here, as the district court noted, the disappearance of the claim did not result from a court dismissal, but rather from NNHC's unilateral withdrawal of the claim by failing to include it in its amended complaint. This change did not alter the legal relationship between the parties because NNHC remained at liberty to bring the claim again at a later point. *See Szabo Food*

30    NEWPORT NEWS HOLDINGS v. VIRTUAL CITY VISION

*Serv. v. Canteen Corp.*, 823 F.2d 1073, 1076-77 (7th Cir. 1987) (holding that a "dismissal . . . without prejudice . . . is not the practical equivalent of a victory for defendant on the merits" because "[t]he plaintiff may refile the complaint" and "[t]he defendant remains at risk").

VCV further argues that the district court's award to VCV of costs related to NNHC's copyright claim necessarily made VCV the prevailing party. However, in awarding VCV costs, the court specifically noted that, in its view, costs could be awarded to a non-prevailing party. *See* J.A. 2112 n.1. Moreover, as mentioned above, the statute states "the court may allow the recovery of full costs by or against *any* party. . . . [T]he court may also award a reasonable attorneys' fee to the *prevailing party* as part of costs." 17 U.S.C. § 505 (emphasis added). If the statute had intended every party who received costs to be a prevailing party for purposes of attorneys' fees, the words "prevailing party" in the statute's second sentence would be superfluous, for everyone receiving costs would fall into that category. Such a reading "would ignore the basic principle of statutory interpretation instructing courts to 'avoid a reading which renders some words altogether redundant.'" *Lane v. United States*, 286 F.3d 723, 731 (4th Cir. 2002) (citation omitted). Accordingly, we hold that the district court did not err in finding that VCV was not a prevailing party on NNHC's claim.

### III.

For the foregoing reasons, the opinion of the district court is affirmed in all respects.

*AFFIRMED*